UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF | NUMBER |
| **WAYBRUN HEBERT**<br>**SHELENA HEBERT** | **03-18467** |
| DEBTORS | CHAPTER 7 |
| **DR. JOHN KILLOUGH**<br>**LISA KILLOUGH** | |
| PLAINTIFFS | ADV. NO.<br>**04-1049** |
| VERSUS | |
| **DR. WAYBRUN HEBERT, III**<br>**SHELENA HEBERT** | |
| DEFENDANTS | |

**MEMORANDUM OPINION**

Plaintiffs John and Lisa Killough sued to establish nondischargeable claims against debtors Waybrun Hebert III and Shelena Hebert.  The claims arise out of an employment agreement under which John Killough went to work for Waybrun Hebert's professional corporation in September 1998.

The plaintiffs did not establish that any obligation owed them was nondischargeable under 11 U.S.C. §523(a).  Accordingly, the plaintiffs' complaint as amended[1] will be dismissed for reasons set forth in this opinion.

---

[1] Plaintiffs' case was not a model of good pleading.  It began with an original complaint filed March 11, 2004 (P-1).  In response to defendants' motion for a more definite statement, plaintiffs first filed a pleading styled "More Definite Statement" (P-27), and later an amended complaint (P-29).  Finally, just days before trial, plaintiffs moved on an expedited basis for leave to file their Third Objection to the Discharge in Bankruptcy (P-127) and Fourth Objection to the Defendants/Debtors Discharge in Bankruptcy (P-129).  The court granted leave to file those pleadings on July 12, 2005 (P-157), and treated them as amendments to the complaint.  Plaintiffs never obtained leave to file their Second Amended Complaint on June 20, 2005

**Procedural History**

John and Lisa Killough sued Foot Specialists of Louisiana, Inc. ("FSL") on September 3, 2002. Some time afterward, they amended the state court petition to name the Heberts as defendants. Waybrun and Shelena Hebert filed chapter 7 on October 30, 2003. The complaint in this adversary proceeding urges that the liability for claims made in the state court lawsuit may not be discharged in debtors' bankruptcy.

After plaintiffs' case in chief at trial, the court granted defendants' motions under Fed. R. Bank. P. 7052, incorporating Fed. R. Civ. P. 52(c), for partial judgment on several claims. The court dismissed all claims against Shelena Hebert for lack of evidence. The court also dismissed for lack of evidence plaintiffs' claims against Waybrun Hebert III under 11 U.S.C. §§523(a)(2)(B) and (a)(4).[2] The remaining claims against Dr. Hebert are those under 11 U.S.C. §§523(a)(2)(A) and (a)(6).

**Facts**

Dr. Waybrun Hebert ("Hebert") is a podiatrist practicing in the vicinity of Houma, Louisiana. In the summer of 1998, Hebert contacted Dr. John Killough ("Killough"), another podiatrist then participating in a residency program in Texarkana, Texas, with a

---

(P-91), but the claims in the third and fourth amendments essentially are identical to those in the Second Amended Complaint.

[2] Bankruptcy Code §523(a)(2)(B) excepts from discharge a debt for money, property or services obtained by –

    (B) use of a statement in writing –
      (i) that is materially false;
      (ii) respecting the debtor's . . . financial condition;
      (iii) on which the creditor to whom the debtor is liable for such money, property or services . . .
       reasonably relied; and
      (iv) that the debtor caused to be made or published with the intent to deceive.

Bankruptcy Code §523(a)(4) excepts from discharge debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." The Court held that the plaintiffs did not show any fiduciary relationship between Dr. Killough and Dr. Hebert, only an employer-employee relationship.

2

proposal for employment. Hebert wanted to hire a podiatrist to staff a podiatric practice he planned to buy from Dr. Richard G. Palecki.[3] After at least one telephone conversation with Hebert concerning a start date and salary, Killough traveled to Louisiana in July 1998 to meet Hebert, to visit one of the hospitals at which Hebert performed surgery and to observe surgical procedures.

After Killough returned to Texarkana, Hebert sent him a draft employment agreement under which FSL would hire Killough.[4] Killough paid Margie Gray McMahon, a lawyer, $125 to review the proposed contract. Ms. McMahon faxed Killough a letter on August 5, 1998 with proposed changes to the contract.[5] The two podiatrists signed a revised employment contract incorporating the changes shortly thereafter.[6] Under the agreement, Hebert's wholly-owned corporation, Foot Specialists of Louisiana, Inc. ("FSL"), hired Killough for two years starting September 1, 1998. FSL agreed to pay Killough $4250 each month, plus a bonus calculated according to the following formula: "to the extent that 30% of all revenues from all sources actually received in collected funds by Employer during any calendar month during the term of this Agreement exceeds $12,750.00, Employer shall pay to Employee 30% of the excess . . . ."[7]

---

[3] Dr. Palecki testified that Hebert eventually bought the building, equipment and good will associated with his practice for $47,744.00.

[4] Draft employment agreement of July 23, 1998 (Plaintiffs' Ex. 4). Notably, Hebert is *not* a party to the employment agreement.

[5] August 5, 1998 letter from Margie McMahon to John Killough (Plaintiffs' Ex. 5).

[6] Signed employment agreement (undated) (Plaintiffs' Ex. 3).

[7] Signed employment agreement, Article III, paragraph 3.01 (Plaintiff's Ex. 3). Killough testified that in summer 1998, his residents' salary was only $13,000.

3

Killough alleged that there were oral undertakings in addition to the written agreement. Specifically, Killough testified that Hebert promised Killough would be made a partner, and enjoy a "six figure income." However, the contract makes no references to Killough's becoming an owner of the practice.[8] Killough also testified that Hebert promised him help in obtaining board certification in surgery without completing a formal training or residency, through a process Killough described as "grandfathering" through an "alternate pathway."[9] The employment agreement contains no reference to the certification process or program, though Killough insisted at trial that he would not have left his residency program without that commitment, because a podiatrist could earn more money with the certification.

Killough moved his family to Louisiana and bought a house. After working at the Palecki clinic for a week in August 1998, he started running FSL's clinic on September 1, 1998. The evidence disclosed no problem in the parties' working relationship until November or December 1998. Killough believed that by then, for the first time since he started working for FSL, his billings exceeded the agreed point at which he was entitled to a bonus. Killough approached Jodi Rouse, FSL's office manager, and asked about the bonus calculation. Rouse told the plaintiff to discuss the bonus calculation with Hebert.

The parties' testimony conflicts at this point.

---

[8] Because FSL is a corporation, Killough could not become a "partner," though Killough may have believed that he would become a FSL stockholder at some point.

[9] Dr. Killough's testimony on direct examination did not identify the specific certification or other credential he expected to secure through the "alternate pathway," or the certifying authority that issued the credential. However, the deposition of James Lamb, the Executive Director of the American Board of Podiatric Surgery ("ABPS"), admitted into evidence at trial, clarified this issue. Lamb testified that until the end of 2000 APBS offered an "alternative method" for becoming board certified in podiatric surgery. (June 15, 2005 Deposition of James Allen Lamb, p. 8. lines 15-21, Defendants' Ex. 16). The alternative method allowed podiatrists who had not completed the required residency training to become board certified by sitting for an examination and certifying that they had performed a certain number of specified surgical procedures. (Defendants' Ex. 16, p. 10, lines -25, p. 11, lines 1-25, p.12, line 1).

4

Killough testified that Hebert said the $4250 bonus threshold was a typographical error, and that $12,750 was the proper bonus threshold. Hebert testified that he and Killough had agreed that $12,750 was the correct threshold, and that Killough himself pointed out the error. Hebert also testified that the contract contained another error in paragraph 3.01. He claimed that the plaintiff's bonus should have been based on Dr. Killough's billings alone, rather than billings of both doctors. Hebert said that Killough knew this all along. Hebert also testified that he had not clarified the alleged errors in the parties' written agreement before Killough raised them in late 1998 because he'd never read that part of the signed contract until he initialed and altered it, at some point after Dr. Killough began working for FSL.

Dr. Killough disputes Dr. Hebert's version of events. He insists that he did not agree to the contract changes.

Neither party disputes that FSL calculated Dr. Killough's bonus using the higher threshold for the duration of the two-year agreement. Dr. Hebert conceded on cross-examination that Dr. Killough's bonus would have been much higher had it been calculated based on the lower billing threshold in the written agreement.

Dr. Killough completed the initial two year term, and then signed a new contract for a second two year term.[10] The 2000 contract established a bonus threshold of $12,750 of funds collected by Killough – precisely the terms Hebert insisted both parties intended in the 1998 contract. Dr. Killough admitted on cross-examination that there had been no breach of the 2000 agreement.

After the second agreement expired, Dr. Killough left FSL's employment, sold his house and moved away from Houma. He later filed the state court lawsuit concerning the

---

[10] August 31, 2000 employment agreement (Defendants' Ex. 4).

5

employment agreement, which was stayed upon Hebert's bankruptcy filing pursuant to 11 U.S.C. §362(a).

## Analysis

I.    <u>Claim under 11 U.S.C. §523(a)(2)(A)</u>

To succeed under section 523(a)(2)(A), the objecting party must prove that: (1) the debtor made representations; (2) at the time the representations were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on the representations; and (5) that creditor sustained losses as a proximate result of the representations. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

Debts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud "involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin*, 963 F.2d 809, 913 (5th Cir. 1992) (citation omitted). Although intent to deceive may be inferred from a "reckless disregard for the truth or falsity of a statement . . . ," *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005), a debtor's "honest belief, even if unreasonable, that a representation is true and that the [debtor] has information to justify it does not amount to an intent to deceive." *Id.*

Section 523(a)(2)(A) requires that a creditor justifiably rely on the debtor's representation. *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is gauged by an individual standard of the creditor's own capacity and knowledge, or the knowledge that may fairly be charged against him from facts he can observe. *In re Vann*, 67 F.3d 277, 281 (5th Cir. 1995). When relevant facts should have been readily apparent to the creditor, or the creditor learned facts that should have served

6

as a warning of deception by the debtor, then the reliance may not be justifiable and the creditor must independently investigate the facts. *Id.*

Plaintiffs' confused pleading makes determining the precise claim difficult. The pretrial order describes plaintiffs' claim as a "breach of contract" that was "broken because of misrepresentations, misconduct and fraud." However, a breach of contract claim could be brought against only FSL, not Dr. Hebert, who was not a party to Dr. Killough's employment agreement. Therefore, the plaintiffs' claim under section 523(a)(2)(A) must be based on Dr. Hebert's alleged misrepresentations to Dr. Killough concerning the contract.

A. Bonus threshold

Even assuming the terms of the agreement concerning the bonus calculation were misrepresented and changed unilaterally by Dr. Hebert, Dr. Killough's reliance on the alleged misrepresentations must have been justifiable. Killough testified on direct examination that Hebert's position concerning the bonus threshold disturbed him. He also claimed that Jodi Rouse, FSL's office manager, discouraged him from pursuing the matter because it would be detrimental to his practice in Louisiana.[11]

On cross-examination, however, Dr. Killough conceded that he never communicated his complaint to Dr. Hebert in writing; never consulted a lawyer; and in fact, continued to accept payment under the contract. Although Killough claimed that he was not being compensated properly and despite the contract provision allowing him to terminate the parties' relationship on 90 days' notice, the plaintiff apparently elected to forego protesting Hebert's decision concerning the contract provisions. Dr. Killough's

---

[11] Under cross examination Dr. Killough testified that *both* Ms. Rouse and Dr. Hebert told him not to pursue the dispute because his future in medicine in Louisiana could be jeopardized.

7

decision apparently rested on the non-compete clause in the employment agreement that prevented him from practicing in Terrebonne and Lafourche parishes, the cost of re-establishing his practice elsewhere, and the potential disruption to his family members' lives.

Despite all the problems the changes in the terms of the employment agreement allegedly caused for Dr. Killough, he signed a second two-year contract with essentially the same terms. Thus, even if the original agreement could be considered relatively null because Dr. Killough did not agree to changes Hebert allegedly made unilaterally, Killough's continued performance under the contract tacitly confirmed the agreement and cured its relative nullity. La. Civ. Code arts. 2031, 1842. *See also, Gamble v. Jessen, et al.*, 509 So.2d 1041, 1043 (La. App. 3$^d$ Cir. 1987) (plaintiff accepting calculation of his compensation during business relationship with defendant, and objecting to the calculation method only after the relationship dissolved, not entitled to additional compensation). Killough's continued performance under the agreement after Dr. Hebert allegedly changed it belies the plaintiff's claim that he justifiably relied on the initial bonus threshold.

B.   "Partnership"[12] potential

Dr. Killough insisted that he relied on a false promise that he would become a partner in Dr. Hebert's podiatric practice. However, his testimony concerning the possibility of becoming a co-owner of the podiatric practice suggests that the plaintiff did not have a definite agreement for Killough to become partner.

---

[12]   See footnote 8, above.

8

Killough testified that the possibility that he might become a co-owner of FSL was important to his decision to sign the contract. However, although Killough consulted a lawyer concerning the draft agreement, the agreement he signed made no provision for him to become part owner of the practice. Killough admitted on cross-examination that no other writing contained that undertaking. Thus, the contemporaneous written evidence of Dr. Killough's agreement does not support his claim.

Even more telling is that when Dr. Killough renewed his employment agreement in 2000, the parties did not insert any provision for plaintiff's becoming a co-owner of the practice. The absence of any provision is even more startling, and casts doubt on plaintiff's claims, because it came after Killough's suggestions for revisions to the earlier form of contract.

Finally, the vagueness of the evidence concerning the agreement supports a finding that there was no definite agreement for Killough to become partner. Specifically, Dr. Killough offered no evidence from which the court could conclude the point – if any – at which Dr. Killough would become eligible to be a co-owner. In addition, Killough acknowledged that he and Hebert had no agreement concerning a percentage of ownership to which Killough would become entitled even if he were to become a co-owner.[13]

C.  Surgical certification

Killough also contends that Hebert promised that Killough could become surgically certified while he worked for FSL. The evidence on this point paints an incomplete picture.

---

[13] Killough testified that one third of all collections from the practice would be applied to "buy in" to the practice. However, he did not testify how long this would continue before the "buy in" figure – whatever it may have been – would be reached.

9

Dr. Killough's testimony on direct examination provided virtually no information concerning this aspect of his claim. On cross-examination by defendants' counsel, Killough testified that he understood that Dr. Hebert was board certified, and could help Killough become certified by an "alternate pathway."[14] Killough hoped to complete the certification process within the first two years he worked for FSL.

Dr. Killough conceded on cross-examination that Dr. Hebert's promise was "vague," and not an absolute guaranty. Certification was not Dr. Hebert's to award. Indeed, Killough could not even name the specific body that would confer the certification, and admitted that the "alternate pathway" to certification ended in 2000.

The vagueness of the evidence concerning the agreement supports a finding that Dr. Hebert did not undertake that Killough would become certified with defendant's assistance. As a result, Killough has failed to prove his claim against Hebert for alleged misrepresentations concerning the certification process.

The evidence proved at most a simple breach of contract claim against only FSL, although Dr. Killough may be estopped from pursuing that claim given his acquiescence in the changes to the contract. A mere breach of contract claim is generally dischargeable in chapter 7. *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003) (even a knowing breach of contract does not make a debt non-dischargeable). Moreover, even if plaintiff did have a direct claim against Dr. Hebert, the evidence supports a finding that Dr. Killough did not justifiably rely on any alleged misrepresentations in continuing to work for Hebert's corporation, even if he believed that Dr. Hebert misled him into signing the contract.

---

[14] See footnote 9, above.

Additionally, Dr. Killough testified that he was overjoyed when Hebert did not renew his contract with FSL. He moved to Illinois and set up a practice, and is earning more than he did at FSL. According to Dr. Killough, he also made an $11,000 profit on the sale of his home. Thus, Killough did not establish by a preponderance of evidence that the debtor's alleged misrepresentation regarding the bonus threshold caused him losses.

In sum, Dr. Killough has not proven his claim under 11 U.S.C. §523(a)(2)(A).

II.     Claim under 11 U.S.C. §523(a)(6)

Finally, Dr. Killough contends that the debtor willfully and maliciously injured him. However, Killough does not specify in his pretrial memorandum or pretrial order the act upon which this claim is based. A deferential reading of the Plaintiffs/Claimants Fourth Objection to the Defendants/Debtors Discharge in Bankruptcy[15] suggests that Dr. Killough contends that Dr. Hebert's management of the podiatric practice and his alleged breach of contract are actions within the scope of 11 U.S.C. §523(a)(6).

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Fifth Circuit has stated that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Keaty*, 397 F.3d 264, 270 (5th Cir. 2005), citing *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998). Debts arising from recklessly or negligently inflicted injuries do not fall within section 523 (a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998).

---

[15] P-129, filed July 8, 2005.

11

The evidence did not establish that Dr. Hebert did anything to Killough that objectively could have been certain to cause harm. Nor did the evidence show that Hebert was motivated to cause Killough harm.

Moreover, the issue of *scienter* aside, Killough did not show that Hebert actually injured him or his property. Killough made a profit when he sold his house in Houma, and he now earns more than he did while employed by FSL. Dr. Killough did not establish by a preponderance of evidence that the alleged acts of Dr. Hebert caused him to suffer any injury whatsoever.

## Conclusion

The Killoughs did not prove that any debt owed to them by Dr. Hebert is non-dischargeable under 11 U.S.C. §§523(a)(2)(A) or 523 (a)(6). Accordingly, the Killoughs' Complaint, and all subsequent amendments to the Complaint, however entitled, will be dismissed.

Baton Rouge, Louisiana, January 13, 2006.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE